# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00745-CV

**Selistina Garcia, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. C2001-0712A, HONORABLE GARY L. STEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from an order terminating appellant Selistina Garcia's parental rights to her sons, M.R.G., M.G.O., and A.G. M.R.G. was six years' old at time of trial, M.G.O. was five, and A.G. was almost three. In eleven issues, she complains that the suit brought by the Texas Department of Regulatory and Protective Services ("the Department") should have been dismissed, the trial court should not have admitted certain testimony, the evidence is legally and factually insufficient to support the termination, and section 161.001(1)(O) of the family code is unconstitutional. We affirm the trial court's order of termination.

In her first issue, Garcia contends that the trial court should have dismissed the Department's suit under section 263.401(a) of the family code. *See* Tex. Fam. Code Ann. § 263.401(a) (West 2002). In essence, section 263.401(a) requires a trial court to dismiss the

Department's suit affecting the parent-child relationship if a final order or extension has not been rendered within a year of the trial court's initial order appointing the Department temporary managing conservator. *Id.* The trial court may maintain the suit for up to another 180 days if it finds that the Department's continued managing conservatorship is in the child's best interest, makes further temporary orders, schedules a new dismissal date within 180 days, and sets a final hearing before that date. *Id.* § 263.401(b).

On appeal, Garcia complains that the trial court's permanency hearing order of August 27, 2002, extending the suit's pendency, does not: (1) refer to section 263.401, (2) state that the trial court is retaining the cause, or (3) find that the Department's continued temporary managing conservatorship is in the children's best interest. However, the only complaint she raised timely, before the Department concluded its case in chief, was that the order lacked a finding that the Department's continued temporary managing conservatorship was in the children's best interest. *See id.* § 263.402(b) (West 2002) (right to object to failure to dismiss is waived unless party moves to dismiss before Department presents evidence at trial). Garcia has waived her complaints related to the order's failure to refer to section 263.401 or to state that the trial court was retaining the cause. *Id.*; Tex. R. App. P. 33.1(a). As for her complaint related to the finding that the Department's continued temporary managing conservatorship was in the children's best interest, the order states:

> The Court, having reviewed the pleadings and considered all evidence and information required by law, . . . finds that all necessary prerequisites of the law have been satisfied, that this Court has jurisdiction over this cause, and that the following orders are in the best interest of the children the subject of this suit.

2

The order goes on to state that the children's current placements with relatives were in the children's best interest, that the children should continue living in their current placements, and that the Department shall continue as temporary managing conservator.

In her brief, Garcia contends that a "generic, global statement on best interest" is insufficient because section 263.401 "requires a conscious statement by the trial court that continuing the department as temporary managing conservator is in the best interest of the children." Garcia cites no authority to support her contention. The statute requires a finding that the continuation is in the children's best interest, a finding made by this order in its statement that, after considering the pleadings and evidence, the trial court found that the order's provisions were in the best interest of the children, including the continuance of the Department's temporary managing conservatorship. The statute does not require a more explicit finding. We overrule Garcia's first issue on appeal.

In her second issue, Garcia contends that the trial court abused its discretion in admitting testimony from a Department investigator about an allegation of sexual abuse.

A trial court's decision to admit or exclude witness testimony is reviewed under an abuse of discretion standard. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). An abuse of discretion occurs if the trial court acts unreasonably or arbitrarily, without reference to any guiding principles. *Beaumont Bank, N.A. v Buller*, 806 S.W.2d 223, 226 (Tex. 1991). A party complaining of the admission or exclusion of evidence generally must show that (1) there was no legitimate basis for the trial court's ruling, and (2) the error probably caused the rendition of an improper judgment. *Malone*, 972 S.W.2d at 43. Even if it would otherwise be inadmissible hearsay, the family code allows for the admission into evidence of a child's statement

3

describing alleged abuse if the court finds sufficient indications of the statement's reliability and that the child is available to testify or that to protect the child's welfare the statement should be used in lieu of the child's testimony. Tex. Fam. Code Ann. § 104.006 (West 2002).

In a hearing outside the jury's presence, Kelly Herd testified that about a year before trial she interviewed M.G.O., then about four years' old, who told Herd that Garcia put her hands on her genitals and then made M.G.O. and M.R.G. smell her hands. Herd did not remember the exact questions she asked, but stated that her testimony was based on her recollection of the interview a year earlier. She described her usual method of interviewing children, including building rapport, avoiding leading questions, and asking open-ended questions. She was not concerned that M.G.O. might have been coached on how to answer her questions. Herd made an audiotape of the interview but did not know where the tape was at time of trial, and the assistant attorney general stated that she had not known about the tape until Herd's testimony. Although the trial court allowed Herd to testify as to her interview with M.G.O., the court was troubled by the tape's absence and asked the Department to look for the tape and give it to Garcia for review when and if it was located.

Later in the day, the State found the tape. The trial court stated that Garcia should listen to the tape over the lunch hour and allowed Herd to continue to testify. Herd testified similarly as she had in the earlier hearing, telling the jury about M.G.O.'s allegation. The next morning, Garcia complained that the tape indicated that Herd had in fact asked leading questions and that M.G.O. may not have been sure of the difference between the truth and a lie. When the court asked if Garcia wanted to admit the tape into evidence, she answered, "Well, I didn't want to put the tape in evidence. I would have preferred that we would not have had Ms. Herd testify without this tape."

4

The court asked what Garcia wanted to do, and Garcia answered, "I am flumocked [sic] because I think that this tape shows that that testimony should never have come in." Garcia never moved to admit the tape into evidence at that time or later in the trial.

In her brief, Garcia complains that the Department breached its duty to protect evidence and that the trial court erred in allowing Herd's testimony when the State "mishandled" a "critical piece of evidence." However, Garcia did not seek to have the tape admitted into evidence. Aside from Garcia's statement that the tape indicated that Herd asked leading questions, we have no information about the tape's contents or that Herd incorrectly recalled M.G.O.'s accusation that Garcia put her hands to her genitals and then made him smell her hands. Garcia has not shown that the trial court abused its discretion in allowing the testimony. Nor has Garcia shown that Herd's testimony probably caused an incorrect jury verdict. We overrule Garcia's second issue.

In her third and fourth issues, Garcia contends the evidence is legally and factually insufficient to support a finding that she engaged in conduct or knowingly placed the children with anyone who engaged in conduct that endangered their physical or emotional well-being.

A trial court may terminate a parent-child relationship if it finds that the parent has engaged in any of the conduct set out as statutory grounds for termination and that termination is in the child's best interest; the Department must establish these elements by clear and convincing proof. Tex. Fam. Code Ann. § 161.001 (West 2002); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Clear and convincing evidence is an intermediate standard of proof falling between proof beyond a reasonable doubt and the preponderance of the evidence. *C.H.*, 89 S.W.3d at 19. The clear-and-convincing standard requires a "degree of proof which will produce in the mind of the trier of fact a firm belief

5

or conviction as to the truth of the allegations sought to be established." *Id.* at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). We review the legal sufficiency of the evidence by considering "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must maintain appropriate deference to the fact finder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to do so; we disregard evidence that a reasonable fact finder could have disbelieved or found incredible. *Id.* We review factual sufficiency by viewing all the evidence and deciding whether a reasonable fact finder could have resolved disputed evidence in favor of its finding. *Id.* If, after such a review, the disputed evidence is such that a reasonable fact finder could not have formed a firm belief about the truth of the State's allegations, the evidence is factually insufficient. *Id.*; *C.H.*, 89 S.W.3d at 25.

Kelly Herd testified that she became involved with Garcia and her sons the year before trial. Garcia admitted to Herd that she occasionally drank in front of her sons while on medication for depression. She also told Herd that she allows the children to play in the street while she watches from the house. Garcia recounted an incident when she tried to leave A.G. with his father for visitation; when A.G.'s father would not come out of his house, she left A.G. in the yard and drove away. Garcia told Herd that M.G.O. may have learned the word "pussy" from overhearing her talk about her sexual experiences. Herd tried to interview M.G.O. in Garcia's presence, but he was uncooperative, told his mother "fuck you," and squirted at Herd with a water gun. Herd was told by other witnesses that Garcia allowed her boys to hang out of the car window while she drove.

6

Veronica Lopez, A.G.'s aunt, testified that she saw Garcia leave A.G. on the fender of a car at A.G.'s father's house and drive away. A.G. slid off the car and was running toward the busy street after Garcia's car when A.G.'s father ran outside to catch him. Garcia's neighbor Angela Guardiola testified that she saw Garcia's children outside almost every day, frequently unsupervised. On one occasion, they were naked and playing in the street with no supervision. She also testified that she and A.G.'s father were told that Garcia left A.G. alone on a swing and that Garcia once asked her to look after A.G. while Garcia smoked marihuana. Guardiola said she called the police two or three times regarding Garcia's care of the children. She called the police one other time after Garcia came to her house and assaulted her in front of Guardiola's and Garcia's children.

Garcia, who was twenty-four at time of trial in October 2002, testified that she suffered from depression and bipolar disorder. During the previous three years, she had been hospitalized several times for one to two weeks at a time. Each time she was released with prescriptions for medication to control her moods and depression and recommendations that she seek counseling. Following her first two hospitalizations, Garcia stopped taking her medications without consulting a doctor, resulting in "nervous breakdowns" and the return of her depression. Garcia also failed to seek counseling for her depression after she was released the first two times. She was not diagnosed as bipolar until after her latest hospitalization in June 2002, and she testified at trial that she intended to continue taking her prescribed medications for the rest of her life.

Garcia dropped out of school in the ninth grade and later achieved a G.E.D. She got pregnant the first time when she was sixteen; her children all have different fathers, and she testified that all three men were abusive during her relationships with them. M.G.O.'s father was also

7

abusive to M.R.G. and threw him "like a ragdoll" into his crib at least twice. After he abused M.R.G. at least twice, he punched a then-pregnant Garcia in the stomach and she left him. She sought medical treatment after being punched, but refused to press charges. Garcia never sought medical attention for M.R.G. or called the Department or the police to report the abuse, and she allowed that man to have unsupervised visits with M.G.O. She also allowed A.G.'s father, who she testified was the most abusive of all the men, to have unsupervised time with A.G.

Garcia admitted to using marihuana and crack cocaine, saying she used marihuana before A.G. was born, but quit while she was pregnant and had not used it since. She started using crack cocaine about a year before trial, after the boys were removed from her care. She testified that she quit using in May 2002, about five months before trial, and had been clean and sober since then.

In 2001, Garcia was given deferred adjudication for a charge of criminal trespass onto A.G.'s father's property and placed on probation. In October 2001, she pleaded guilty to shoplifting charges. When she did not fulfill some of her probationary conditions in early 2002, probation was revoked and she spent a month in jail. Garcia testified that she was currently on probation for ramming her car into A.G.'s father's car and admitted to "flashing" a neighbor, lifting her shirt and showing her bra while two of her boys were outside with her.

Garcia had not worked in the four months before trial. She said she quit work at that time because she was beginning to have symptoms of depression and a nervous breakdown. Garcia has a history of keeping jobs for very short lengths of time, quitting or getting fired after mere days of work. The last time she had a job for any length of time was when she worked at a grocery store from March 1998 until February 2001. During the periods she did not have a job, her friends and

8

parents gave her money and she received welfare, food stamps, and a small amount of child support. At time of trial, Garcia was living with her parents and had been living there since May 2002.

After receiving a report of negligent supervision in July 2001, the Department offered Garcia counseling and parenting services, and she signed a safety plan in which she stated she would not leave the children unsupervised. Garcia did not seek the offered counseling. She signed another safety plan in August and again did not seek counseling. Garcia admitted to violating a safety plan provision providing that she would not be alone with her children. In September 2001 she was ordered to attend parenting classes, which she did not start until six months before trial, and counseling to address the issues that led to the children's removal from her care. Garcia only went to the counselor two or three times. Garcia also testified that she did not inform the Department of her many changes of address, although she was required to do so, and said at one point she went for months without contacting the Department. Garcia denied allowing her children to play outside in the street unsupervised or ever leaving them unattended.

Psychologist Denine Milam did a one-time evaluation of Garcia and found that she was suffering from depression. Garcia told Milam that she heard voices, but said that medication controlled them. Milam said Garcia was unstable, had high anxiety levels, and was "very damaged" and "struggling hard to make it." Milam also testified that crack cocaine is very difficult to quit and that few people kick the habit entirely. Rodney Keller testified that he saw Garcia three times but mainly worked with M.R.G. and M.G.O. Keller said that the boys have improved over time, and his prognosis has improved from "poor" to "guarded" during the time the boys have been living apart from Garcia. Keller said the boys' early behavior was consistent with children who had been

9

traumatized and possibly sexually abused. Keller said it was possible but very difficult for a person who is bipolar to live a "relatively functional" life. He said that if a bipolar person does not take her medication, she could be a danger to her children.

Joanna Wold, child protective specialist, testified that she believed termination of parental rights was in the children's best interest, largely because Garcia and the fathers of her children had not fulfilled their obligations under the various safety plans. Wold said that Garcia had not demonstrated financial independence, had not found independent housing or stable employment, and had not addressed the issues that led to the children's removal in the first place. Sherry Flume, child protective services supervisor, also testified that in her opinion, the best interest of the children would be served by termination of parental rights and placement for adoption. Flume explained that in making such a determination, the Department considers the desires of the children, their emotional and physical needs now and in the future, and an evaluation of risks. Flume said the parents had not demonstrated that they were presently able to care for the children adequately, nor had they shown that they were becoming able to care for them. She stated that, given the opportunities the parents had been given and their past histories, she did not believe that they would do so in the future. Flume said that even if there had been no allegation of sexual abuse, based on Garcia's behavior since the Department became involved, she would still recommend termination of her parental rights.

Garcia's uncle testified that while Garcia had custody of her sons, he was never concerned that the children were being abused, nor did he hear the boys having conversations of a sexual nature; at that time, he only had limited contact with the boys, not day-to-day contact. Since the children's removal, he and his wife had been caring for M.R.G. and A.G.; M.G.O., who was

placed with another relative, visited his brothers every two weeks. Garcia's aunt said that she had never seen or heard the boys behaving or speaking in a sexual manner. She said all three boys are bonded with and miss Garcia, and M.G.O. misses living with his brothers.

Dr. John Vanderpool testified that he treated Garcia in June 2002 when she was admitted to the hospital for about eight days. He discharged her with prescriptions for a mood stabilizer, an anti-psychotic medication, and an anti-depressant. He said that Garcia demonstrated hypersexuality, which is a major issue for people suffering from bipolar or manic problems. Dr. Julie Robinson, Garcia's current psychiatrist, testified that she had taken Garcia off the anti-depressant in a successful attempt to stabilize her moods. Robinson has verified by blood tests that Garcia was taking her mood stabilizer; there is no test to check for anti-psychotics other than a patient's self-reporting. She stated that if Garcia continues to take her medications as prescribed, she will probably remain stable and be able to function normally, including caring for children. Robinson said it took about three months to stabilize Garcia, who had been stable for almost one month. Robinson first treated Garcia in 2001, but Garcia dropped out of treatment until July 2002.

The evidence in this cause is legally and factually sufficient for a reasonable trier of fact to form a firm conviction that Garcia engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered the children. When viewed in the light most favorable to the jury's findings, the evidence shows that Garcia, who suffers from depression and bipolar disorder, twice went off her medication, resulting in a relapse or worsening of her medical condition. There was witness testimony that she allowed her young sons to play unsupervised in the street, left her toddler in a front yard by a busy street and drove away, and drank alcohol while she

11

was supposed to be caring for the boys. Representatives of the Department testified that they believed M.G.O.'s outcry about the improper sexual behavior exhibited by Garcia. While her sons were out of her custody and she was supposed to be taking parenting classes and getting counseling, she began abusing crack cocaine. Over the eighteen months that her sons were out of her custody, it was only in the last four months that doctors began to consider her stable. She did not seek counseling on a regular basis until shortly before trial, after being hospitalized a third time. There was testimony that crack cocaine is very hard to quit and that if she stopped taking her medication again she could be a danger to herself and her children. Garcia testified that, although M.G.O.'s father abused M.R.G. as an infant and Garcia while she was pregnant, she was not concerned about allowing him to have unsupervised visitation with M.G.O. She also testified that she allowed A.G.'s father, who was even more abusive, to have unsupervised visitation with the toddler. Although Garcia testified that she did not leave her sons unsupervised and denied leaving A.G. alone in a yard, it was for the jury to hear the evidence and witness testimony and disregard evidence that a reasonable fact finder could have disbelieved or found incredible. We overrule Garcia's third and fourth issues on appeal.

In another five issues, Garcia attacks the sufficiency of the evidence to support several other jury findings and attacks the constitutionality of section 161.001(1)(O) of the family code, one ground for termination.[1] Because the jury's verdict had multiple grounds on which termination could

---

[1] In her fifth and sixth issues, Garcia contends the evidence is legally and factually insufficient to show that she knowingly placed or allowed her children to remain in conditions that posed a danger to their physical or emotional well-being. In her seventh and eighth issues, she contends that the evidence is legally and factually insufficient to show that she failed to comply with a court order. In her ninth issue, Garcia contends that section 161.001(1)(O) is unconstitutional.

12

be based and we have held that there is legally and factually sufficient evidence to support the jury's finding that her conduct endangered the children or that she placed the children with persons who engaged in such conduct, we need not address Garcia's fifth, sixth, seventh, eighth, and ninth issues.

In her tenth and eleventh issues, Garcia attacks the sufficiency of the evidence to support the jury's finding that termination of her parental rights was in her sons's best interest. Representatives of the Department testified that based on their observations of the boys and their interactions with Garcia and her family, they believed termination was in the children's best interest. Keller said that the boys's prognosis had greatly improved since they were removed from Garcia's care. There was testimony that Garcia repeatedly stopped taking her medication and relapsed as a result. Although there was testimony that the boys missed their mother and loved her, this does not overcome the evidence supporting a finding that the children's best interest will be best served by termination of Garcia's rights. We overrule Garcia's tenth and eleventh issues on appeal.

Having overruled Garcia's issues on appeal, we affirm the trial court's judgment terminating her parental rights to her sons.

_____

David Puryear, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed: June 26, 2003

13